Exhibit A

1  Sin-Ting Mary Liu
   CA Bar Number 282884
2  Aylstock, Witkin, Kreis & Overholtz, PLLC
3  875-A Island Drive #144
   Alameda, CA 94502
4  Phone: 510-698-9566
   Fax: 760-304-8933
5  Email: mliu@awkolaw.com

6
   Bryan Aylstock
7  FL Bar Number 78263
   17 East Main Street
8  Suite 200
9  Pensacola, FL 32502
   Phone: 850-202-1010
10 Fax: 850-916-7449
   Email: baylstock@awkolaw.com
11 Pro hac vice application to be filed

12
   David Slade
13 AR Bar Number 2013143
   Carney Bates & Pulliam, PLLC
14 519 W. 7th St.
15 Little Rock, AR 72201
   Phone: 501.312.8500
16 Fax: 501.312.8505
   Email: dslade@cbplaw.com
17 Pro hac vice application to be filed

18
   Attorneys for Plaintiffs
19

20

21              SUPERIOR COURT OF THE STATE OF CALIFORNIA

22               IN AND FOR THE COUNTY OF SAN FRANCISCO

23

24

25 KRISTANALEA DYROFF,                  Case No.: **CGC-17-560775**
   individually and on behalf of the
26 estate of WESLEY GREER,
   deceased,
27          Plaintiffs,               COMPLAINT

28

**FILED**
San Francisco County Superior Court

AUG 1 6 2017

CLERK OF THE COURT
BY: _____
                    Deputy Clerk

**BY FAX**
ONE LEGAL LLC

1   vs.

2   EXPERIENCE PROJECT;
3   KANJOYA, INC.; and ULTIMATE
    SOFTWARE GROUP, INC.
4

5         Defendants

6        Plaintiff KRISTANALEA DYROFF, individually and on behalf of the Estate of

7   WESLEY GREER, deceased ("Plaintiffs"), by and through their counsel, allege as follows:

8   **I.    INTRODUCTION**

9

10        1.    This action arises from wanton, reckless, and negligent acts and practices related

11   to the development and operation of the Experience Project, a social network website maintained

12   and operated jointly by Defendants Experience Project, Kanjoya, Inc. and Ultimate Software

13   Group, Inc.

14        2.    Experience Project was premised on encouraging users to anonymously post and

15   discuss personal experiences, then funneling those users into groups based on shared experiences

16   and attributes. In directing users into groups, Defendants used advanced data mining algorithms

17   to identify not only the content of its users' posts, but also the underlying intent and emotional

18   state of the user. Defendants used this data for a variety of commercial purposes extrinsic to the

19   website, but also used this information to manipulated users, steering them into additional groups

20   through a proprietary recommendations functionality.

21

22        3.    However, due to this climate of anonymity, and due to Experience Project's

23   algorithmic functionality grouping users based on common attributes, a virulent culture of drug

24   trafficking emerged on the website. Specifically, dealers would openly advertise in groups with

25   names such as "I Am a Drug Addict," "I Can Help With Connect In Orlando FL," "I Am a Heroin

26   Addict," "I Miss Using Heroin," and "Heroin Heroin and more Heroin." Moreover, Experience

27

28

Project's functionality would then steer vulnerable addicts to *additional* pages devoted to the sale of drugs.

4.      Worse, still, many of the drug traffickers operating on Experience Project laced their drugs with fentanyl, a deadly synthetic opioid 50 times stronger than regular heroin and a leading cause of fatal overdoses.

5.      The website's core business model—mining its users' data to learn content, meaning, and intent behind the posts on Experience Project—alerted or should have alerted Experience Project to the profound danger it posed to its most vulnerable users, in the form of lethal drugs being trafficked on its website.   Moreover, as Experience Project explicitly acknowledged in a public post in 2016, it was the recipient of myriad requests from information from law enforcement regarding illegal activity on the website, which fact should also alerted Experience Project to the deadly risk posed to its members.  However, Experience Project also publicly acknowledged its antipathy towards law enforcement efforts to curb illegal activity on its site, making the decision to suspend the website rather than comply with information requests.

6.      In the face of an opioid epidemic that claims the lives of over 100 Americans a day, this callous disregard for users' safety is unconscionable. Indeed, Experience Project's level of engagement and management in (1) learning the meaning of and intent behind posts, (2) using that information to manipulate individual users and funnel them into pockets of activity on the website, including harmful, drug-trafficking activity, (3) shielding bad actors from law enforcement requests, and (4) developing policies and procedures (as well as code-based functionalities executed on the website) to effectuate its goals demonstrate that Defendants were not mere publishers of third party content on their website.  Instead, and acting in bad faith, they were active participants in the events giving rise to Plaintiffs' claims.

7.      Defendants' acts and practices had lethal effects for Wesley Greer, a recovering heroin addict who, suffering a relapse, joined Experience Project and was steered, by the website's functionality, to myriad heroin-trafficking groups.  In one or more of those groups, he encountered the drug dealer Hugo Margenat-Castro, who advertised heroin on the website. In reality, Margenat-Castro sold heroin laced with fentanyl, a fact he hid in his posts, but a fact that should have been known to Defendants, as discussed below.

8.      In August of 2015, after having been steered to multiple heroin-trafficking groups on Experience Project and receiving emails from Experience Project alerting him to posts in those groups, Wesley Greer contacted Margenat-Castro and purchased what he believed to be heroin. In reality, Greer purchased heroin laced with fentanyl, and accordingly overdosed and died, which death was ruled a homicide by the medical examiner.

9.      The acts and omissions of Defendants were directly and proximately responsible for Wesley Greer's homicide, and Plaintiffs bring the following action, accordingly, asserting claims of negligence, wrongful death, premises liability, failure to warn, civil conspiracy, and unjust enrichment.

## II.     PARTIES, JURISDICTION, AND VENUE

10.     At the time of his death, Wesley Greer was a citizen of the United States of America, and a resident of Glynn County, Georgia. The survival causes of action in this matter are based on violations of Wesley Greer's rights under California state law.

11.     Plaintiff Kristanalea Dyroff is and was at all relevant times mentioned herein, a resident of Glynn County, Georgia.  Plaintiff Dyroff is the natural mother of Wesley Greer, deceased, and brings this action individually and as the Successor in Interest of the Estate of Wesley Greer.

12.    Defendant Experience Project ("Experience Project") is a social networking website, currently owned by Defendant Ultimate Software Group, Inc. Experience Project was, at all times relevant to this litigation, a social network consisting of various online communities or groups, and allowing its members to anonymously post and answer questions in said communities or groups.  Experience Project was active from 2007 until March, 2016, at which point it announced an indefinite suspension of its activities.  However, the website remains active in an archived form and, as described below, is registered to Defendant Ultimate Software Group. At all times relevant to this litigation, Experience Project was headquartered in San Francisco, California, sharing office space and key executives (including CEO Armen Berjikly, CTO Neil Sheth, and SVP Erik Darby) with Defendant Kanjoya, Inc. and, following its acquisition in 2016, Defendant Ultimate Software Group, Inc.

13.    Defendant Kanjoya, Inc. ("Kanjoya") is a subsidiary of Defendant Ultimate Software Group, Inc. ("Ultimate Software Group"), having been purchased by Ultimate Software Group on September 30, 2016 and merged within that company.  Following the purchase, Kanjoya's headquarters in San Francisco (456 Montgomery Street, Suite 500, San Francisco, CA 94104) became the San Francisco office of Ultimate Software Group.  Similarly, Kanjoya's officers and/or executives were subsumed within Ultimate Software Group's corporate structure, and its intellectual property—including Experience Project, Experience Project's algorithms and other proprietary technology and assets (including but not limited to its source code and data sets) were acquired and maintained by Ultimate Software Group.  This includes the URL www.experienceproject.com which is registered to Ultimate Software Group as of the date of the filing of this Action.

14.     As described above, Defendant Ultimate Software Group, Inc. is an American technology company headquartered in Weston, Florida.  On September 30, 2016, Ultimate Software Group acquired Defendant Experience Project and Defendant Kanjoya.  As described above, and throughout this Complaint, Defendant Ultimate Software Group has, at all times relevant to this litigation, owned, operated, maintained, controlled, and utilized all technology and intellectual property of Defendants Experience Project and Kanjoya.

15.     At all times relevant to this Action, some permutation of Defendants Experience Project, Kanjoya, and/or Ultimate Software Group conducted business within this jurisdiction and venue.

16.     Further, the acts, practices, and omissions giving rise to this Action occurred in this jurisdiction.

17.     Further, Defendant Experience Project and its successors and/or agents and/or principals and/or participants in joint venture—Kanjoya and Ultimate Software Group—have at all times relevant to this litigation stated, through Experience Project's terms of service, that all members of its service "will resolve any claim, cause of action or dispute (claim) [such members] have with us arising out of or relating to this Statement or Experience Project exclusively in the U.S. District Court for the Northern District of California or a state court located in San Francisco County, and [such members] agree to submit to the personal jurisdiction of such courts for the purpose of litigating all such claims. The laws of the State of California will govern this Statement, as well as any claim that might arise between [members] and us, without regard to conflict of law provisions."

## III.   FACTUAL BACKGROUND

### A.  The Experience Project, Generally

18.     Experience Project is a social networking website consisting of various "online communities." During the site's active operation,[1] members would submit "experiences"—their personal, first-person stories about various life experiences they had. Users could then form or join communities based on these experiences and/or interests, and interact with other members who shared them. The website's founder, Arman Berjickly, explained the Experience Project as follows:

> People will come to the site and type in something that's important to them – "I like dogs," "I have lung cancer." Immediately you're drawn into groups that are structured around these experiences. Experience is a loosely defined term. It could be "I'm going to Stanford." It could be "I underwent chemotherapy." We have over 100,000 of these experiences. Within each one of these are first-person stories of what it's like to do x, y or z. And within those stories there are comments and so forth. So a new user to the site searches for something that is of paramount importance to them and realizes, "I'm not alone with whatever this is. Look at all these other people going through it."[2]

19.     A central theme of Experience Project is its users' anonymity.   Berjickly explained that "People do register with the site, but they pick an anonymous user name. We don't want to know their real name, their phone number, what town they're from. We want to make

---

[1] As discussed in further detail below, Experience Project operated from 2007 until March, 2016, when it announced it would suspend new registrations indefinitely.
[2] Whiting, Sam, *"Armen Berjikly connects cat lovers and cancer survivors in his online experience project."* SF Gate (Jun. 1, 2008) (available at http://www.sfgate.com/magazine/article/Armen-Berjikly-connects-cat-lovers-and-cancer-3281789.php)

sure they're older than 16, that kind of thing. Ironically, what our users tell us is, 'Even though this is anonymous, it's the most real representation of me anywhere.'"[3]

20.    As of May 2016, the site had over sixty-seven million "experiences shared," over fifteen million "friendships made," and over six million "questions asked."[4]

### i. Experience Project's Revenue Sources

21.    Once users established an account and joined a group or groups, they could ask questions of—or answer questions posed by—other members.  It is this interaction, and the continued engagement of users on its website, that fueled Experience Project's revenue.

22.    Experience Project's revenue came from multiple sources.  First, the website served advertisements to its users.  Second, the website (which was developed by Berjikly and computer scientists at Stanford) mined users' posts on the website, identifying the posts' contents and using machine learning models to divine the underlying emotions associated with those posts.  The technology behind the data mining used with Experience Project was concurrently developed and used by Defendant Kanjoya, the data company that was also started and run by Berjickly.  Upon information and belief, Kanjoya analyzed users' behavior on Experience Project and then sold those data sets to interested parties, for various purposes, as is evidenced by a recent working paper from the Federal Reserve Bank of San Francisco, titled "Measuring News Sentiment," which details in its methodology how Kanjoya and Experience Project profited off of Experience Project users' data:

---

[3] *Id.*
[4] www.experienceproject.com

[O]ur method is to use a proprietary machine learning predictive model, developed by the company Kanjoya, which scores text in terms of the degree to which it expresses each of a large number of different emotions. This model assesses entire sentence structures and assigns a probability score as to whether the sentence falls into a certain emotional category. The model is trained on data compiled from Kanjoya's social networking site, the Experience Project (EP). Users on the EP site discuss personal experiences and feelings (text) while also identifying (tagging) the emotions they are feeling and soliciting emotional reactions from other users. This provides a mapping from text to emotional labels that Kanjoya uses to train a predictive sentiment model via structured machine learning. Research samples from the EP corpus have been used previously in the Natural Language Processing literature.

...

The Experience Project corpus spans millions of distinct emotional utterances with granular emotional labels (over 130 total) and no given topical focus. Samples of this corpus have been previously shown to yield high quality sentiment and emotion models. The corpus was collected over 8 years and comprises contributions from a population that is highly diverse in terms of gender, age, race/ethnicity, and geographical location. Crucially, labels are assigned to textual utterances based on the author's own stated corresponding emotion or the reactions of other users when interacting with the content. Observing both these emotion labels (outputs) and the text (inputs) assigned that label allows for structured machine learning techniques to train a predictive model.[5]

23.     Thus, Experience Project (and its sister company, Kanjoya) employed a business model that deliberately and meticulously monitored its users' communications in an effort not only to learn _**what**_ people were discussing on Experience Project, but _**why**_ they were discussing such subjects, as well as what their emotional state was while discussing those subjects.

---

[5] Available at http://www.frbsf.org/economic-research/files/wp2017-01.pdf

24. Upon information and belief, Defendant Ultimate Software Group, which purchased and subsequently merged with Defendant Kanjoya, continues to own and utilize the "corpus" of Experience Project data described in the preceding paragraph, as well as the machine learning technology developed by Experience Project and Kanjoya through, *inter alia*, users' posts to Experience Project.

25. Finally, beyond monetizing the website through ads and data mining, Experience Project also sold "tokens" to its users, who could then use those tokens to ask questions of other users in their groups.

### ii. Experience Project's Format and Anonymity Allowed for a Rampant Subculture of Harmful Illegal Activity.

26. Because of Experience Project's format of encouraging people to gather in groups based on shared experiences, and because of the strict anonymity policy dictated by Experience Project (in an effort to encourage more candid sharing of information), a substantial portion of the website became devoted to illegal activity, including but not limited to the blatant trafficking of illegal drugs such as heroin.

27. Indeed, Experience Project is replete with groups and stories whose entire purpose is the sale of heroin and other drugs. For example, a screenshot of the following group, titled "I Need Heroin," contains numerous posts in which members offer contact information to sell opiates in and around the Orlando area. Equally disconcerting, at the bottom right portion of the screen, Experience Project recommends and directs the viewer to click on "More People Who Need Heroin," thereby encouraging the visitor to investigate *more* groups (and their attendant members) dedicated to acquiring this illegal, lethal drug:

28.    Upon    information    and    belief,    Experience    Project's    recommendations
functionality as demonstrated in the above image—written into the website's source code—relied
on data such as, but not limited to, the content of a given group, the content posted by the users
within the group, and demographic data known by Experience Project about the given user,
including the geographic location of the user.  In point of fact, this was expressly admitted by
Berjickly: "Immediately, you're drawn into groups that are structured around these experiences
[that the user identifies as being relevant to himself or herself." *See* paragraph 17, *supra*.

29.    In  the  context  of  drug-trafficking-oriented  groups,  this  recommendations
functionality created an echo chamber for visitors, luring them into temptation after temptation.

30.    Exhibit 1 provides a summary—that is by no means exhaustive—of screenshots
of comparable Experience Project groups, with names such as "I Am a Drug Addict," "I Can

Help With Connect In Orlando FL," "I Am a Heroin Addict," "I Miss Using Heroin," "I Love Xanax," "I Love Benzodiazepines," "I Am Addicted to Opiates," "Heroin Heroin and more Heroin," *etc.*

31.     Perversely, users are able to provide "reviews" of drug dealers who traffic on Experience Project, as demonstrated by the following post from "SUFF3R," in the group "I Shoot Up Heroin."  SUFF3R states "If you need that in Orlando or the surrounding area feel free to call or text me anytime.  I have nothing but good reviews on here so u know it's legit...hmu!!"



32.     And, in point of fact, SUFF3R does appear to have positive feedback from several clients, as posted in another group, titled "Miss Using Heroin."





33.     Even when Experience Project was alerted to groups in which illegal drugs such as heroin were rampantly trafficked, Defendant's response was simply to inform a user that "[t]his experience may contain mature content, as flagged by the community," and to instruct the user to "[p]lease click away if you do not want to see this content." *E.g.*:

34. Accordingly, Experience Project created and nurtured an anonymous environment in which fatally dangerous narcotics were brazenly sold by its users, with no consequences coming from Defendant.

35. Defendants' behavior is all the more unconscionable in light of its contribution to a larger, devastating opioid epidemic that is sweeping the United States. The opioid crisis now kills over 100 Americans daily.[6] Websites such as Experience Project—with strong anonymity

_____

[6] Khazan, Olga. *Trump's Opioid Commission Calls for a State of Emergency.* The Atlantic (Jul. 31, 2017) (available at https://www.theatlantic.com/health/archive/2017/07/government-panel-calls-for-a-state-of-emergency-on-opioids/535485/).

policies and a stated antipathy towards law enforcement investigations of illegal conduct occurring on their online premises—have contributed significantly to the spread of the epidemic.[7]

### iii. The Experience Project Was Designed and Run, in Significant Part, to Encourage Criminal Activity So Extensively as to Rise to the Level of Collusion.

36.     As described above, membership on Experience Project was premised on the anonymity of its users. As Berjickly noted, "We don't want to know [a user's] real name, their phone number, what town they're from." The impetus behind this policy was to encourage users to share experiences with the least amount of inhibition possible. The greater the anonymity, the more "honest" the post, and therefore the more valuable the data to which Experience Project had unfettered access.

37.     Similarly, the more users felt that they could post anonymously, the more likely they would perceive Experience Project as an exclusive outlet for their online communications with others. Social networks all compete for their user base's "engagement," as the more users they have, and the longer those users interact with the social network, the larger a data set the network then may monetize.

38.     Moreover, precisely because of Experience Project's (and Kanjoya's) business model for monetizing users—applying sophisticated algorithms for users' posts in order to learn the meaning of the post *and* the emotional state of the poster[8]—it cannot be denied that

_____

[7] Gabler, Ellen and Rich Harris. *On Reddit, Intimate Glimpses of Addicts in Thrall to Opioids.* New York Times (Jul. 20, 2017) (available at https://www.nytimes.com/2017/07/20/us/opioid-reddit.html).

[8] Kanjoya's LinkedIn page further describes the capacity of the algorithms developed and deployed by Defendants via Experience Project: "Kanjoya enables companies to go inside the heads and hearts of their employees and customers. Our industry-first technology finds the meaning in the voices of your key people to build fundamentally stronger organizations....*Our*

Experience Project was aware of the life-threatening severity of the activity taking place on its website. This egregious behavior is compounded by the fact that Experience Project would recommend *further* groups to its vulnerable users, containing *additional* content devoted to the trafficking of drugs (as evidenced, *inter alia*, by the screen shots above and in Exhibit 1).

39.     As described in greater detail below, law enforcement was aware of drug trafficking on Experience Project, and the website was repeatedly and lawfully served with information requests, subpoenas, and warrants related to drug trafficking on the site.

40.     Ultimately, rather than deciding to purge the site of its illegal content or else aid law enforcement, Experience Project decided to shut the website down entirely.

41.     In March, 2016, Experience Project announced it would suspend new registrations indefinitely. Its website currently states that "Experience Project is taking a break," but that the company "look[s] forward to meeting again soon."[9] While new registrations are suspended, the existing content of the website remains publicly available. A March 21, 2016 open letter to users from the Company further explains Experience Project's rationale for suspending the social network, stating, *inter alia*,

> From day one, **privacy of our users has been paramount**, and we have never allowed names, phone numbers, or addresses. This approach bucked every trend, and challenged our ability to build an advertising-based business, but we passionately believe it provided the foundation for some of the most meaningful relationships imaginable. And you are proof that we were right!

*products build off of a decade of investment in proprietary research in how people communicate emotion and intent*. Built with the leading computational linguistics minds at Stanford University, Kanjoya's natural language processing (NLP) and machine learning methods deliver meaning and context from any unstructured data in real-time, from surveys to performance reviews to interview notes and beyond." (available at https://www.linkedin.com/company-beta/217633/) (emphasis added)
[9] www.experienceproject.com

But there is no denying that the way people expect to use social media today is markedly different than it once was, and as the primary use has moved from web to mobile, our hallmark attributes like long-form stories are not aligned.

But, there are deeper, and more troubling trends than formats. *Online anonymity, a core part of EP, is being challenged like never before. Governments and their agencies are aggressively attacking the foundations of internet privacy with a deluge of information requests, subpoenas, and warrants.* We, of course, always support proper law enforcement efforts, but the well-documented potential for even abuse, even if unintentional, is enormous, and growing.[10]

42.     As the above letter acknowledges, a core tenet of Experience Project was to provide a space to users who, *inter alia*, sought to use the website and its anonymity to skirt the law.  When it became difficult or even impossible to protect its users from the "abuse" of law enforcement, the website closed.  This readily demonstrates a collusive component to Experience Project, the institution, vis-à-vis its members who used the website for illegal activity, including Hugo Margenat-Castro, who availed himself of Experience Project's general format—including but not limited to its anonymity policy, supportive attitude towards drug trafficking, recommendations functionality, and institutional resistance to complying with law enforcement requests for information—to sell heroin, and fentanyl disguised as heroin, to unsuspecting individuals with fatal results, as the case of Wesley Greer demonstrates.  Indeed, Experience Project's level of engagement and management in (1) learning the meaning of and intent behind posts, (2) using that information to manipulate individual users and funnel them into pockets of activity on the website, including harmful, drug-trafficking activity, (3) shielding bad actors from

_____

[10] http://www.experienceproject.com/until-we-meet-again#email (emphasis added), attached as Exhibit 2.

law enforcement requests, and (4) developing policies and procedures (as well as code-based functionalities executed on the website) to effectuate its goals demonstrate that Defendants were not mere publishers of third party content on their website. Instead, and acting in bad faith, they were active participants in the events giving rise to Plaintiffs' claims.

### B. Wesley Greer and the Experience Project

43.    Wesley Greer was born on August 15, 1986.

44.    In 2007, while playing football with friends while attending West Virginia University, Wesley suffered a knee injury and, in the course of his recovery for that injury, was over-prescribed opioid pain killers. He subsequently became addicted, first to opioids and then to heroin.

45.    In 2011, Wesley began treatment in South Florida, completing five separate rehab programs but relapsing each time.

46.    In August, 2013, he completed a 9-month stay in Faith Farm, a faith-based rehab center in Florida. Following his time at Faith Farm, Wesley remained clean. He chose to stay at Faith Farm after completing the program, living there and working for the Assistant Director to do intake, teach portions of the program and help other participants complete their GED.

47.    In January, 2015, despite great effort, Faith Farm was unable to hire Wesley on a full-time basis, so he moved on to run a halfway house. However, Wesley felt that the drug-seeking environment at the halfway house put him in danger of relapse.

48.    To support Wesley, his mother and stepfather moved from their home in Washington, D.C., to Brunswick, Georgia, and encouraged Wesley to move to Brunswick with them and help them renovate their home. Wesley moved to Brunswick in February, 2015.

49.     On or about August, 2015, shortly before his 29th birthday, Wesley conducted a Google search to find heroin in Jacksonville, Florida, and was directed to Experience Project. Shortly thereafter, he created an account with the website under the handle "Gaboy5224."

50.     At the same time, he paid for "tokens"—described in paragraph 24, above—which allowed him to pose questions to other users. *See* Exhibit 4 (an exemplar screen for purchasing tokens).

51.     Wesley then posted the to the Experience Project group "where can i score heroin in jacksonville, fl."

52.     On August 17, 2015, at 4:53 P.M., Experience Project sent an email to Wesley, informing him that "Someone posted a new update to the question 'where can i score heroin in jacksonville, fl," providing both a hyperlink link and a URL directing Wesley to this update. *See* Exhibit 3.

53.     Upon information and belief, that update—or one substantially similar—was posted by Hugo Margenat-Castro, an Orlando-based drug dealer who maintained an Experience Project account under the handle "Potheadjuice."

54.     Margenat-Castro's Experience Project posts purported to sell heroin—they are posted in groups such as "I Love Heroin" and "Heroin in Orlando"—but in reality Margenat-Castro was selling heroin mixed with fentanyl.  Fentanyl is a synthetic opioid that is fifty times stronger than heroin, making it so potent that a dose the size of three grains of sugar is lethal to an adult.

55.     Soon after receiving the email from Experience Project, on the night of August 17, 2015, shortly before or at midnight, Wesley called Margenat-Castro, whose number he had gotten from Experience Project.  Wesley placed multiple calls to Margenat-Castro in the early

morning hours of August 18, 2015, as he drove from Brunswick, Georgia to meet the drug dealer in Orlando, Florida. By late morning, August 18, Wesley had unknowingly purchased a lethal dose of fentanyl from Margenat-Castro. He drove home to Brunswick.

56.     On the evening of August 18, 2015, Wesley had dinner with his mother and stepfather at their house. He spoke about building a dock over the lake in their backyard to have the wedding ceremony for himself and his girlfriend. As he was leaving they made plans to paint the front door the next morning. He kissed his mother, telling her that he loved her and his stepfather.

57.     On August 19, 2015, at 11:55 A.M., Wesley was declared dead of fentanyl toxicity, from the drugs he had purchased from Margenat-Castro, through Experience Project. His body was found by his mother, at his home. The medical examiner listed his death as a homicide.

### i. Hugo Margenat-Castro's Practice of Selling Fentanyl—Disguised as Heroin—Was or Should Have Been Known to Experience Project, and Was Facilitated by Experience Project.

58.     Under the handle "Potheadjuice," Margenat-Castro actively and routinely used Experience Project groups and forums to sell a mixture of heroin and fentanyl, which he misrepresented as merely heroin. Margenat-Castro began using Experience Project to traffic his fentanyl mixture, disguised as heroin, from approximately January, 2015 until October, 2015, posting in groups such as "I Love Heroin" and "Heroin in Orlando" and providing his telephone number and statements that the heroin he sold was of good quality. In a plea agreement entered into in March, 2017, Margenat-Castro estimated selling ten bags of fentanyl-laced heroin via Experience Project, every day, seven days a week, since January, 2015. *See United States of*

*America v. Hugo Margenat-Castro*, Case No. 6:16-cr-211-Orl-37KRS (M.D. Fla.) (Dkt. No. 25) ("Plea Agreement").

59.     Margenat-Castro's Plea Agreement makes clear that he utilized Experience Project explicitly for purposes of drug trafficking, selling fentanyl-laced heroin to addicts four to six times a day. *Id.* at 20. In the course of selling this fentanyl mixture disguised as heroin on Experience Project, Margenat-Castro availed himself of, *inter alia*, the site's anonymity policy; the myriad groups related to the sale of drugs, which had proliferated on the site; and the recommendations functionality of the website that would steer vulnerable addicts to *additional* groups devoted to drug trafficking, creating an echo chamber of lethal temptation.   Upon information and belief, Margenat-Castro was protected in this activity by Experience Project's antipathy towards law enforcement, whom the website characterized as "aggressively attacking the foundations of internet privacy."

60.     Margenat-Castro's Experience Project profile page shows 1,439 profile views.[11] Beyond Wesley's unknowing purchase of a lethal dose of fentanyl from Margenat-Castro, virtually all of those 1,439 visitors *also* viewed his page to message and buy drugs from Margenat-Castro. As described above, Margenat-Castro admitted to selling heroin to individuals between four and six times daily, every day, from January to October, 2015. Plea Agreement at 20.[12]

61.     Indeed, prior to Wesley Greer's death, law enforcement agencies had targeted Margenat-Castro for his drug trafficking through Experience Project, purchasing heroin in

[11] http://www.experienceproject.com/about/potheadjuice
[12] Assuming one page visit per sale, five sales a day, each day from January 1 – October 1, one arrives at a total 1,370 sales/page views.

controlled buys on March 31, 2015 and June 24, 2015.  Further, on April 1, 2015 and June 25, 2015, Margenat-Castro had been arrested for possession, with the intent of sale, of fentanyl, among other drugs.    The arrest stemmed from Margenat-Castro's sale of drugs through Experience Project.  One week before the date of arrest, on June 18, 2015, Margenat-Castro had openly advertised on Experience Project, posting in at least one group—"I Can Help With Connect in Orlando FL"—and stating "if ur on vaca in Orlando and lookin or sick.txt me. 407-two,seven,six-1888.  no BS. not a bum or middle man. all u have to do is come to me n I show u stuff n we swap.  no sketchy…"

62.     Following Margenat-Castro's June arrest, a state court criminal proceeding commenced on July 13, 2015.

63.     Upon information and belief, by August 17, 2015, Experience Project would have or should have had actual knowledge of Margenat-Castro's activity on its website, including the true nature of the drugs he was selling, which he misleadingly purported to be heroin.  As described above, Margenat-Castro sold heroin laced with fentanyl via the Experience Project, and was the subject of at least two, separate controlled buys, which each resulted in a separate arrest, as well as a criminal proceeding.

64.     Moreover, during this time, Margenat-Castro was blatantly marketing his drug trafficking enterprise on Experience Project in various groups. Experience Project's primary monetization mechanism stemmed from mining its users posts to learn both the content, meaning, and intent of each post, and it is therefore evident that it *knew* that users were discussing heroin—and trafficking heroin—on its site. This point is amply demonstrated by the fact that Experience Project *recommended additional* drug trafficking groups to its users, as shown above. Additionally, Margenat-Castro was not a casual seller.  In the nine-to-ten-month period that he

was active on Experience Project, he estimated selling roughly 1,400 bags of heroin laced with fentanyl. The data trace of these prolific transactions should not have escaped Experience Project.

65. Finally, as stated by Experience Project, the website serially received information requests from law enforcement—so much so that the company ultimately decided to close down—which requests should have alerted them to instances of drug trafficking of narcotics on their website by a multitude of their members, including Margenat-Castro.[13]

66. Accordingly, long before the date of Wesley Greer's fatal overdose, Experience Project knew or should have known that heroin laced with fentanyl was being trafficked through its website. Further, Experience Project knew or should have known specifically, that Margenat-Castro, himself, was trafficking in heroin laced with fentanyl through its website.

67. Further, after Wesley's death, Florida law enforcement *again* observed Margenat-Castro's drug sales on Experience Project and, using the contact information obtained from his posts, arranged a controlled buy on September 3, 2015. The undercover officer corroborated Margenat-Castro's identity with that of "Potheadjuice," his Experience Project handle. Following a toxicology report that confirmed that the substance purchased from Margenat-Castro was fentanyl, an arrest warrant was issued on October 7, 2015.

68. At one point between the date of the controlled buy (9/3/15) and the issuing of the arrest warrant (10/7/15), Experience Project was *again* notified of Margenat-Castro's activity on

---

[13]Upon information and belief, in circumstances such as these, where drug dealers are trafficking through online intermediaries, law enforcement will likely serve subpoenas months before conducting controlled buys in order to gather background information on the subject such as a name, address, or other pertinent information. Such a subpoena would alert Experience Project to Margenat-Castro's bad acts perpetrated on the website.

the website by law enforcement.  In response, posts by Potheadjuice were deleted, ostensibly by the website.  However, by October 1, 2015, Margenat Castro was again posting under his Potheadjuice handle.  It is unknown how many others bought, and likely overdosed on, fentanyl from Margenat-Castro after his account was reinstated.

69.    Although Experience Project is "taking a break," because of too many requests from law enforcement, Ultimate Software Group (through its merger with Kanjoya) allows the website to continue in its archived form and keeps open the possibility of its resurrection.  Additionally, Ultimate Software group (through its merger with Kanjoya) continues to monetize the data and other intellectual property it acquired, which all stem from Experience Project's bad acts.

70.    It was unconscionable for Experience Project to allow Margenat-Castro to prey upon its other users.  At minimum, the website had or should have had knowledge of Margenat-Castro's lethal drug sales in the form of information requests from law enforcement associated with the controlled buys, arrests, or court proceedings that pre-dated Wesley's purchase of fentanyl and subsequent fatal overdose.  Moreover, for a website whose primary revenue stream comes from data mining user posts to divine not only the substance of each communication, but also the *emotional state and intent of each poster*, it is clear that Experience Project either knew or should have known of Margenat-Castro's drug trafficking via the website.  Relatedly, Experience Project's recommendations functionality had the lethal effect of guiding heroin addicts from drug trafficking group to drug trafficking group, *helping* this vulnerable population find *additional* forums for lethal drugs; as was the case for Wesley.  Finally, beyond allowing users to post and facilitating the online sale of drugs on the website, Experience Project went the

further step of alerting vulnerable addicts—through emails and other push notifications—every time a new post or response occurred in groups devoted to the sale of heroin.

71.     The data mining algorithms and attendant functionalities (along with the advertising revenues and token sales gleaned by Experience Project) enriched not only Defendant Experience Project, but also Defendant Kanjoya and Defendant Ultimate Software Group.  It was Kanjoya (later acquired by Ultimate Software Group) who reaped Experience Project's "corpus" of user data and who used Experience Project to refine the algorithms that acquire that corpus. Kanjoya monetized, and continues to monetize, the Experience Project data and the technology that created those data, as a result of the cavalier, self-serving, and ultimately lethal policies and procedures that allowed people such as Margenat-Castro to traffic narcotics without penalty on Experience Project.

## COUNT I
### Negligence
### (Survival Action)

72.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in the paragraphs above.

73.     As described throughout this Complaint, Experience Project—operating jointly with Kanjoya—acted negligently in the development, operation, and maintenance of the Experience Project website.  Such negligent acts included, but are not limited to, (1) allowing users to anonymously traffic in illegal, deadly narcotics; (2) allowing users to create groups obviously dedicated to the sale and use of such narcotics; (3) intentionally steering users to *additional* groups that were obviously dedicated to the sale and use of such narcotics; (4) sending users alerts to posts within groups that were obviously dedicated to the sale and use of deadly narcotics; (5) allowing users to remain active accountholders despite having openly trafficked in

such narcotics for almost one year, and in the wake of multiple law enforcement actions; (6) allowing users to remain active account holders despite having knowledge—including but not limited to knowledge acquired through proprietary technology—of the subjects and meaning of those users' drug-trafficking-related posts; and (7) general antipathy towards law enforcement efforts aimed at curbing illegal activity on Experience Project, made manifest in explicit company policy.

74.     These acts, practices, and omissions, were undertaken with such bad faith, and were so intertwined with the content of the drug-trafficking posts, themselves, that Defendants cannot be said merely to have acted as publishers of the posts at issue. Rather, the acts, practices and omissions giving rise to this claim (and all claims contained within this Complaint) demonstrate that Defendants acted (1) in bad faith, (2) in an editorial capacity, and (3) in a manner that not only touches on the creation of the unlawful content at issue, but also the independent manipulation of their most vulnerable accountholders, based on *separate* data that Defendant created and maintained, independently.

75.     Indeed, Experience Project's level of engagement and management in (1) learning the meaning of and intent behind posts, (2) using that information to manipulate individual users and funnel them into pockets of activity on the website, including harmful, drug-trafficking activity, (3) shielding bad actors from law enforcement requests, and (4) developing policies and procedures (as well as code-based functionalities executed on the website) to effectuate its goals demonstrate that Defendants were not mere publishers of third party content on their website. Instead, and acting in bad faith, they were active participants in the events giving rise to Plaintiffs' claims.

76.     Each of the above-identified negligent acts was facilitated in furtherance of Defendants' business model of data mining, and was specifically written into Defendants' source code (or else incorporated into Experience Project's corporate policy) in a manner intended to facilitate—and indeed facilitating—all of Margenat-Castro's bad acts complained of herein.

77.     Defendants owed a duty of care to Wesley Greer.

78.     As a result of each of the above-identified negligent acts, Wesley Greer was harmed in a series of events culminating with the unknowing purchase of lethal fentanyl, and his resulting murder.

79.     Defendants' negligence was a substantial factor in causing Wesley Greer's harm.

80.     As a result of Defendants' negligence, Plaintiffs are entitled to actual damages in an amount to be proved at trial.  Further, the aforementioned acts were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**COUNT II**
**Wrongful Death**
**California Code of Civil Procedure §§ 377.60, *et seq.***
**or, in the alternative, O.C.G.A. §§ 51-4-1, *et seq.***
**and O.C.G.A § 19-7-1**

81.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in the paragraphs above.

82.     Plaintiff Dyroff is entitled to assert this claim, as Wesley Greer died without issue or spouse, and Plaintiff Dyroff would be entitled to Wesley Greer's estate by intestate succession.

83.     Wesley Greer's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants.

84.     As a direct and proximate cause of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants, Plaintiffs suffered actual and intangible damages, in an amount to be proved at trial.

85.     The aforementioned wrongful and/or negligent acts and/or omissions of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiff Estate of Wesley Greer and Plaintiff Dyroff of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## COUNT III
### Negligence – Premises Liability
### (Survival Action)

86.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in the paragraphs above.

87.     Social networks such as Experience Project, with their emphasis on building and cultivating virtual "communities" and "groups," are the twenty-first century's equivalent of traditional premises, as recognized by tort law.

88.     Just like restaurants, bars, theaters, fairs, auditoriums, stadiums, amusement parks, and all other businesses open to the public, Experience Project and Kanjoya enticed members of the public to congregate on its website in a manner that is entirely consonant with traditional concepts of public gathering.

89.     Moreover, all users of Experience Project were required to pay for access to the virtual premises of the website. As described above, users "paid" through purchasing tokens to ask questions, by viewing advertisements shown in the group-specific web pages, or through agreeing to allow Experience Project and Kanjoya to mine their data for profit. As Berjickly, himself, acknowledged, Experience Project was sustained through the monetization of its users:

Experience Project members have left 8 million "experiences" on the site, ranging from a single sentence to essay length, according to Berjikly. "Every one of them has a host of people who have had that experience and are passionate about it. In replicating that across the spectrum, we got a strong sense that we could evolve this platform into a hub for doing good." And if venture-backed Experience Project charges corporations for access to that hub, community members aren't going to complain, he says. *"Our users realize we need to keep the lights on," he says. "They don't hold any grudges against us for being a company."*[14]

90.     Beyond the clear economic interest of Experience Project and Kanjoya in luring members to its site and keeping them engaged on the site for as long as possible—including through the use of its recommendations functionality, as described throughout—Experience Project and Kanjoya also could be said to lure users, such as Wesley Greer, to its website simply to further their own purposes (*inter alia,* gathering user data to further the corpus used to train the machine learning algorithms used by all Defendants, serving targeted ads, and selling tokens).

91.     The assurances made by Experience Project in the course of inviting prospective users to join the website included basic safety and indeed a heightened protection from harm. These representations were made through the website's various terms of service, as well as forward-facing representations made on Experience Project's main website, at all times relevant to this litigation.[15]

92.     Experience Project's assurances to its prospective members and actual members, coupled with its business purposes and the fact that its users form communities or groups, as

_____

[14] http://www.xconomy.com/san-francisco/2011/04/05/experience-project-launches-broadcause-putting-social-media-to-work-for-charitable-causes-and-the-corporations-backing-them/2/# (emphasis added)

[15] Such representations include but are not limited to Experience Project's Terms of Service, Privacy Policy, and Community Guidelines.

traditionally conceived in centuries of common law legal tradition, placed heightened duties of care upon Experience Project, Kanjoya, and the Ultimate Software Group.

93.     Experience Project and Kanjoya owned the premises at issue—namely, the Experience Project website and all of the attendant technology and functionality that was employed to mine and manipulate user data related thereto.

94.     Experience Project and Kanjoya were negligent in the use, maintenance, and operation of the Experience Project website, as detailed throughout this Complaint. As described throughout this Complaint, Experience Project—operating jointly with Kanjoya—acted negligently in the development, operation, and maintenance of the Experience Project website. Such negligent acts included, but are not limited to, (1) allowing users to anonymously traffic in illegal, deadly narcotics; (2) allowing users to create groups obviously dedicated to the sale and use of such narcotics; (3) intentionally steering users to *additional* groups that were obviously dedicated to the sale and use of such narcotics; (4) sending users alerts to posts within groups that were obviously dedicated to the sale and use of deadly narcotics; (5) allowing users to remain active accountholders despite having openly trafficked in such narcotics for almost one year, and in the wake of multiple law enforcement actions; (6) allowing users to remain active account holders despite having knowledge—including but not limited to knowledge acquired through proprietary technology—of the subjects and meaning of those users' drug-trafficking-related posts; and (7) general antipathy towards law enforcement efforts aimed at curbing illegal activity on Experience Project, made manifest in explicit company policy.

95.     These acts, practices, and omissions, were undertaken with such bad faith, and were so intertwined with the content of the drug-trafficking posts, themselves, that Defendants cannot be said merely to have acted as publishers of the posts at issue. Rather, the acts, practices

and omissions giving rise to this claim (and all claims contained within this Complaint) demonstrate that Defendants acted (1) in bad faith, (2) in an editorial capacity, and (3) in a manner that not only touches on the creation of the unlawful content at issue, but also the independent manipulation of their most vulnerable accountholders, based on *separate* data that Defendant created and maintained, independently.

96.     Indeed, Experience Project's level of engagement and management in (1) learning the meaning of and intent behind posts, (2) using that information to manipulate individual users and funnel them into pockets of activity on the website, including harmful, drug-trafficking activity, (3) shielding bad actors from law enforcement requests, and (4) developing policies and procedures (as well as code-based functionalities executed on the website) to effectuate its goals demonstrate that Defendants were not mere publishers of third party content on their website. Instead, and acting in bad faith, they were active participants in the events giving rise to Plaintiffs' claims.

97.     Each of the above-identified negligent acts was facilitated in furtherance of Defendants' business model of data mining, and was specifically written into Defendants' source code (or else incorporated into Experience Project's corporate policy) in a manner intended to facilitate—and indeed facilitating—all of Margenat-Castro's bad acts complained of herein.

98.     Defendants owed a duty of care to Wesley Greer.

99.     As a result of each of the above-identified negligent acts, Wesley Greer was harmed in a series of events culminating with the unknowing purchase of lethal fentanyl, and his resulting murder.

100.     Defendants' negligence was a substantial factor in causing Wesley Greer's harm.

101.   As a result of Defendants' negligence, Plaintiffs are entitled to actual damages in an amount to be proved at trial.  Further, the aforementioned acts were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### COUNT IV
### Negligence - Failure to Warn
### (Survival Action)

102.   Plaintiffs re-allege and incorporate by reference all of the allegations contained in the paragraphs above.

103.   Experience Project and Kanjoya were negligent in the use, maintenance, and operation of the Experience Project website, as detailed throughout this Complaint.

104.   Experience Project and Kanjoya had knowledge in their possession of the rampant drug trafficking on the Experience Project website (including the specific acts and practices of Margenat-Castro as complained of herein).

105.   These acts, practices, and omissions, were undertaken with such bad faith, and were so intertwined with the content of the drug-trafficking posts, themselves, that Defendants cannot be said merely to have acted as publishers of the posts at issue.  Rather, the acts, practices and omissions giving rise to this claim (and all claims contained within this Complaint) demonstrate that Defendants acted (1) in bad faith, (2) in an editorial capacity, and (3) in a manner that not only touches on the creation of the unlawful content at issue, but also the independent manipulation of their most vulnerable accountholders, based on *separate* data that Defendant created and maintained, independently.

106.   Indeed, Experience Project's level of engagement and management in (1) learning the meaning of and intent behind posts, (2) using that information to manipulate individual users

and funnel them into pockets of activity on the website, including harmful, drug-trafficking activity, (3) shielding bad actors from law enforcement requests, and (4) developing policies and procedures (as well as code-based functionalities executed on the website) to effectuate its goals demonstrate that Defendants were not mere publishers of third party content on their website. Instead, and acting in bad faith, they were active participants in the events giving rise to Plaintiffs' claims.

107.   Each of the above-identified negligent acts was facilitated in furtherance of Defendants' business model of data mining, and was specifically written into Defendants' source code (or else incorporated into Experience Project's corporate policy) in a manner intended to facilitate—and indeed facilitating—all of Margenat-Castro's bad acts complained of herein.

108.   Defendants owed a duty to their users (including Wesley Greer), and Defendants' failure to warn Wesley Greer of the specific dangers associated with Margenat-Castro, including but not limited to his practice of misrepresenting fentanyl-laced-heroin as heroin in the course of trafficking drugs on Experience Project, amounted to a breach of that duty.

109.   As a result of each of the above-identified negligent acts, Wesley Greer was harmed in a series of events culminating with the unknowing purchase of lethal fentanyl, and his resulting murder.

110.   Defendants' negligence was a substantial factor in causing Wesley Greer's harm.

111.   As a result of Defendants' negligence, Plaintiffs are entitled to actual damages in an amount to be proved at trial. Further, the aforementioned acts were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**COUNT V**
**Civil Conspiracy**
**(Survival Action)**

112.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in the paragraphs above.

113.    As described throughout the Complaint, Defendants Experience Project and Kanjoya were aware of Margenat-Castro's practice of drug trafficking on Experience Project, and specifically were aware of his selling of heroin laced with fentanyl.

114.    Defendants Experience Project and Kanjoya agreed with Margenat-Castro—and others likes him—and intended that such drug trafficking be committed.  Evidence of this collusion includes, but is not limited to, (1) Defendants' refusal to curtail the conspicuous sale of drugs on groups such as, *inter alia*, "I Love Heroin," and "Heroin in Orlando," (2) Defendants' antipathy towards information requests from law enforcement; (3) Defendants' recommendations functionality that actively steered vulnerable addicts towards additional, heroin-trafficking groups; (4) Defendants' prodding of heroin addicts with push notifications and emails alerting them to new posts in drug-trafficking groups, in an effort to return them to the Experience Project website; and (5) Defendants' knowledge throughout not only of the content of Margenat-Castro's posts, but also the underlying intent behind them, due to Defendants' proprietary algorithmic technology.

115.    These acts, practices, and omissions, were undertaken with such bad faith, and were so intertwined with the content of the drug-trafficking posts, themselves, that Defendants cannot be said merely to have acted as publishers of the posts at issue. Rather, the acts, practices and omissions giving rise to this claim (and all claims contained within this Complaint) demonstrate that Defendants acted (1) in bad faith, (2) in an editorial capacity, and (3) in a manner

that not only touches on the creation of the unlawful content at issue, but also the independent manipulation of their most vulnerable accountholders, based on *separate* data that Defendant created and maintained, independently.

116.    Indeed, Experience Project's level of engagement and management in (1) learning the meaning of and intent behind posts, (2) using that information to manipulate individual users and funnel them into pockets of activity on the website, including harmful, drug-trafficking activity, (3) shielding bad actors from law enforcement requests, and (4) developing policies and procedures (as well as code-based functionalities executed on the website) to effectuate its goals demonstrate that Defendants were not mere publishers of third party content on their website. Instead, and acting in bad faith, they were active participants in the events giving rise to Plaintiffs' claims.

117.    Further, Defendants' collusion was motivated by greed.  Defendants were incentivized to have as many users, engaging with as many groups, and posting as many questions and responses, as possible.  That way, Defendants could monetize those users by, *inter alia*, (1) applying their algorithms and mining user data, which Defendants continue to monetize to this day; (2) serving more advertisements; and (3) selling "tokens" to users to facilitate the asking and answering of questions within groups.

118.    Such acts evidence more than mere knowledge of Margenat-Castro's actions, on the part of Defendants, and in fact evidence cooperation and agreement.

119.    As a result of Defendants' actions, Plaintiffs are entitled to actual damages in an amount to be proved at trial.  Further, the aforementioned acts were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

1

2

**COUNT VI**
**Unjust Enrichment**
**(Survival Action)**

3

4        120.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in

5    the paragraphs above.

6        121.    As a result of their wrongful acts and practices complained of herein—as well as

7    the continued use of the corpus of data and algorithms trained from such data—Defendants were

8    unjustly enriched at the expense of Plaintiffs.  Defendants accepted and retained those benefits

9    under circumstances that make it inequitable to be retained.

10

11        122.    Accordingly, Plaintiffs seek disgorgement of those benefits, along with all other,

12    equitable relief that this Court deems proper.

13

**COUNT VII**
**Drug Dealer Liability Act**
14    **California Health and Safety Code §§ 11700,** *et seq.*
15    **(Survival Action)**

16        123.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in

17    the paragraphs above.

18        124.    Through the acts, practices, and omissions described throughout this Complaint,
19

20    Defendants were (1) participants in the marketing of illegal controlled substances, and (2)

21    contributed to the sale, administration, or furnishing of an illegal controlled substance, pursuant

22    to California's Drug Dealer Liability Act, California Health and Safety Code §§ 11700, *et seq.*

23        125.    As a result of Defendants' acts and omissions committed in violation of the Drug

24    Dealer Liability Act, each Plaintiff sustained damages, both economic and noneconomic.
25

26        126.    As a result of Defendants violations of the Drug Dealer Liability Act, Plaintiffs

27    are entitled to economic, noneconomic, and exemplary damages, as well as attorneys' fees and

28    costs.

WHEREFORE, Plaintiffs pray for judgment against Defendants as hereinafter set forth.

**PRAYER FOR RELIEF**

Plaintiffs requests of this Court the following relief:

A.     For general damages, in an amount to be proven at the time of trial;

B.     For medical, incidental, hospital, psychological care and other expenses, in an amount to be proven at the time of trial;

C.     For loss of earnings and earning capacity, in an amount to be proven at the time of trial;

D.     For an award of pre-judgment and post-judgment interest as provided by law;

E.     For consequential damages, in an amount to be proven at the time of trial;

F.     For exemplary or punitive damages against Defendants, as provided by law;

G.     For funeral and burial expenses and all other wrongful death and survivorship damages as allowed by law;

H.     For an award providing for payment of costs of suit; and

I.     For such other and further relief as this Court may deem just and proper.

Dated this 16th of August, 2017.

Sin-Ting Mary Liu
CA Bar Number 282884
Aylstock, Witkin, Kreis & Overholtz, PLLC
875-A Island Drive #144
Alameda, CA 94502
Phone: 510-698-9566
Fax: 760-304-8933
Email: mliu@awkolaw.com

COMPLAINT - 37

1

2

3      Bryan Aylstock
       FL Bar Number 78263
4      17 East Main Street
       Suite 200
5      Pensacola, FL 32502
       Phone: 850-202-1010
6      Fax: 850-916-7449
7      Email: baylstock@awkolaw.com
       Pro hac vice application to be filed
8

9      David Slade
       AR Bar Number 2013143
10     Carney Bates & Pulliam, PLLC
       519 W. 7th St.
11     Little Rock, AR 72201
       Phone: 501.312.8500
12     Fax: 501.312.8505
13     Email: dslade@cbplaw.com
       Pro hac vice application to be filed
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1









# Exhibit 2



Home      Groups   Stories   Questions   People                    Sign In

# Until We Meet Again...

March 21, 2016

Nearly a decade ago, we started Experience Project with a mission of harnessing social media to bring empathy and understanding to all, through the power of anonymously shared human experience. Since then, tens of millions of experiences have been shared by hundreds of millions of people. Users have gotten married, saved each other's lives, and entertained and comforted each other late into the night. Every single day, we've been privileged to see community members find connection to ideas, feelings, and people that changed their lives.

However, many important things have changed since 2006 that risk both our ideals and our ability to deliver on them. **So, it is with heavy hearts that we have decided to pause this chapter in Experience Project history and regroup for the future**, rather than risk our beliefs, and more importantly, our users' trust. We've struggled mightily with this decision for a long time, and pursued every reasonable alternative, but we are confident that it is the right thing to do at this time. If you'd like to understand more detail about this decision, please read more here.

We created EP to provide a safe, private place online to share the experiences that mattered most, and to deliver it fairly and reliably to every user, however and wherever they were comfortable. Doing good for the world was not a side effect, it was the goal.

Over the last decade, while social media has evolved from Blogger to Snapchat, and become increasingly focused on pictures, short text, and individual popularity, EP remained focused on anonymous, long-form text stories from everyday people who were recognized for their experiences above all else. From day one, **privacy of our users has been paramount**, and we have never allowed names, phone numbers, or addresses. This approach bucked every trend, and challenged our ability to build an advertising-based business, but we passionately believe it provided the foundation for some of the most meaningful relationships imaginable. And you are proof that we were right! But there is no


denying that the way people expect to use social media today is markedly different than it once was, and as the primary use has moved from web to mobile, our hallmark attributes like long-form stories are not aligned.

But, there are deeper, and more troubling trends than formats. Online anonymity, a core part of EP, is being challenged like never before. Governments and their agencies are aggressively attacking the foundations of internet privacy with a deluge of information requests, subpoenas, and warrants. We, of course, always support proper law enforcement efforts, but the well-documented potential for even abuse, even if unintentional, is enormous, and growing.

At the same time, scores of new laws require compliance with intricate, sometimes contradictory, data privacy regulations for each country, territory, and even state. For example, today there are nearly 30 different agencies that can decide whether sending data, for example, a private message from your inbox, between Europe and the US is "proper."

Finally, the sophistication of "bad apples," as few as they thankfully are, has increased dramatically. They are better able to cover their tracks and evade user bans by using mobile and encryption networks, and they use information to exploit the trust of others through social engineering. These advances, of course, relate to the first point about increasing government information gathering, in an ever escalating game of cat and mouse.

None of these are insurmountable problems, but they require immense resources to address reliably, effectively, and safely at scale. Those are outside the reach of all but a tiny handful of massive companies like Facebook and Google.

So it is with these themes in mind that we have come to the conclusion that it is better to freeze what we have today, instead of letting it erode, and affect our ability to deliver value, safety, and to respect our users' trust and expectations.

What does this all mean? On April 21, 2016, we are pressing "pause" on the site, and will no longer be supporting future posts, messages, or new registrations. We have built tools that will enable you to export your contributions , or delete your account , and will leave those tools up for the foreseeable future. As it should be, what you want to do with your content is up to you. Most stories on EP are timeless, and if you leave yours up, they will undoubtedly help countless others. Over time, we hope to determine how to better realize our mission in the future.

Experience Project is a very big idea that you have made a reality. The need for it -- for empathy, for comfort, for making sure no one ever feels alone -- is as critical as ever. Thank you for being part of this journey with us, and we hope that we can say "welcome home" again in the future.

With love and appreciation,
Your Experience Project Team

## Important Next Steps

How do I export my content so that I can save it?

How do I delete my account and/or posts?

Can I still use the MeToo app?

Can I still browse the site?

What about my supporter/chat payments?

Will Experience Project return in the future?

I have more questions

## How do I export my content so that I can save it?

If you would like to save a personal copy of your stories (with their comments), questions (with their responses), and private message threads, please enter your email address below and press "Export My Content."

When your export is complete, a button will appear below that says "Download My Content", which you must then press to save. Due to the demand, this process may take 1-2 days, but we will email you when it is complete.

*Please note that we cannot export additional content such as whiteboard posts, photo albums, avatars, or responses to other people's content.*

Email: [_____] (Please enter the email address that you would like the link to be sent to)

[ Export My Content ]

## How do I delete my account and/or posts?

8/16/2017    Experience Project - Personal Stories about any Life Ex_____nce 

We hope to leave member contributions standing for some time so that they can continue to inspire other readers. That said, members who do not want to preserve their content can choose to delete their account using the tool below. This tool will be available for at least one month following April 15th.

If you want to remove your account or content from the site, please do so using the tools below.

☑ Preserve my stories for other people to benefit from

| Delete My Account |

*Please note that deletions typically takes 48 hours to complete. If you change your mind within this time, please press "Undo Account Deletion".*

## Will I still be able to use the MeToo app?

No. We will be removing the log-in abilities from the site and the apps on April 21st at 4:00 pm Pacific Daylight Time.

## Can I still browse the site?

Yes, you can still browse through publically available content on the site. To do so, make sure that you're logged out.

## What about my past supporter/chat payments?

Your monthly payment subscriptions have already been cancelled and you will not be charged in the future. Any accounts that currently have a gold supporter star will still be able to keep the feature until the log-in abilities are halted on April 21st, or the user deletes his or her account.

## Will Experience Project return in the future?

We unfortunately cannot guarantee what the future holds for Experience Project and the MeToo apps, but if you would like to be notified if or when

we've better defined the next chapter for Experience Project, please enter your email information below.

Email: [_____]

I'm not a robot

reCAPTCHA
Privacy - Terms

[ Let Me Know ]

# I have more questions

Thank you for supporting us in this journey. Though we will not have staff available to answer questions and assist with account issues in the future, urgent issues can be sent to help@experienceproject.com

[ **Full Site** ]

© Experience Project 2017

**Advertise**     **Help**     **Company Info**     **Privacy**     **Terms**     **Sitema**

# Exhibit 3



Exhibit 4

